THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LYDELL WALLS, Defendant-Appellant.

First District (5th Division)    No. 79-581

Opinion filed August 1, 1980.

Michael G. Cheronis and Nicholas A. DeJohn, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Mark X. Van Cura, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendant was found guilty of deviate sexual assault and indecent liberties with a child. (Ill. Rev. Stat. 1977, ch. 38,

pars. 11—3 and 11—4.) He was sentenced to a term of 50 to 100 years for the deviate sexual assault charge since the trial court found that the indecent liberties charge merged with that offense. On appeal defendant contends that: (1) the trial court erred in denying defendant's motion to quash his arrest and suppress evidence; (2) evidence of a separate attack denied him a fair trial; (3) rebuttal evidence was improperly admitted; (4) prosecutorial misconduct during closing argument denied him a fair trial; (5) he was not proved guilty beyond a reasonable doubt; and (6) his sentence is excessive.

Defendant was separately indicted for his crimes against Anna, the 14-year-old female victim involved in this case, and for the deviate sexual assault, robbery and aggravated kidnapping of Scott Staton. The State elected to proceed on the instant indictments and sought to introduce evidence of the Staton incident in this case. Defendant's pretrial motion to exclude evidence of the Staton crime was denied.

Defendant also made a pretrial motion to quash his arrest and to suppress the evidence gained thereby. The following pertinent testimony was elicited at the hearing on this motion.

Chicago police officer Bass testified that on May 8, 1977, he was assigned to the instant case. He was told that a black-over-gold late model two-door car with license plate number PW 5019 was involved. A license check indicated that the plate was not on file and did not reveal the owner of the car. He also had a general description of the suspect although this was not included in the police report. The description was that of a male Negro, about 30 years old, 5 feet 10 inches to 6 feet tall, medium build, dark skin, medium afro and a mustache. He and his partner began a search for the vehicle and saw a 1969 Buick four-door car otherwise matching the description of the car at 46th and Woodlawn. As they turned around to observe it, it was driven away in the opposite direction. They were unable to follow it because of traffic.

On the following day a surveillance team consisting of about six police cars and 8 to 11 police officers was set up at 46th and Woodlawn. The Buick was seen parked and unoccupied at that location. Bass observed the car from a distance of about a quarter block for half an hour when a male Negro about 30 years old, 5 feet 10 inches tall and of medium build approached the Buick. There was nothing unusual about the man. After he entered the car, Bass drove alongside and exited his car and ordered the man out of the car. Defendant got out, was placed under arrest and transported to a police station. At the time of the arrest, Bass recovered a bottle of vodka from defendant's right coat pocket and noticed that he had a mustache.

Several officers remained with the car until evidence technicians arrived and processed the car. After the technicians had left, two officers

searched the car and recovered a tube of vaseline from the glove compartment.

Bass stated that no arrest or search warrant had been obtained for either the person or the vehicle.

Following argument, the motion to quash the arrest and suppress evidence was denied.

The pertinent evidence at trial established the following facts. At about 11:30 p.m. on May 7, 1977, Anna was walking near 54th and Hyde Park Boulevard on her way home when she was approached by a man whom she identified as defendant. He grabbed her by her shoulder, asked for her money, and struck her as she attempted to break away. Defendant dragged her by her hair into his car and began to drive. Her asked her what her name was and although she responded "Anna," he called her "Arnold." After about two minutes he drove into an alley and told her to remove her pants. She refused initially but when he told her that he had a gun and would shoot her if she tried to leave, she removed them. She was forced to perform an act of oral copulation on defendant who then took a tube from the glove compartment and smeared a vaseline-like substance on his penis and her anus and had anal intercourse with her. Defendant then told her to crawl into the back seat where he again forced her to perform another act of oral copulation and submit to anal intercourse. When he finished, defendant smoked a cigarette.

Defendant crawled back into the driver's seat and drove to the area where he had abducted Anna. During the ride he asked if she were a homosexual, if she had ever hustled, and if she smoked or drank, to which she responded negatively. He also asked if anyone had told her that she sounded like a girl and said that he thought she was cute and would like to see her again. As he drove he drank from a clear, flat bottle. When defendant stopped the car, she got out and walked to the rear of the car. She saw the license number PW 5019 and ran to her home which was about half a block away. She told her mother of the attack and the police were called.

She described her assailant to the policemen who took her to the hospital as being 5 feet 11 inches to 6 feet in height, of medium build, with a mustache, medium to dark skin and a medium to short afro. She described the car as a two-door, gold with a black top, power windows, black interior with an arm rest in the front seat and license number PW 5019.

On May 9, 1977, she was taken to a police station where she viewed a lineup and identified defendant. Following the lineup she was taken to a very large parking lot outside the station where she identified the car in which she was abducted. At trial Anna identified State's exhibit No. 1, a tube of Vaseline Hair Creme, as being the tube that defendant removed

from the glove compartment, and exhibit No. 2, a Smirnoff's vodka bottle, as looking like the one from which defendant drank. She also identified State's exhibits 3, 4, 5 and 6 as being photographs of various portions of the car in which she was abducted.

She testified that although the interior lights of the car were not on while she was in the car and there were no lights in the alley, the area where she was accosted was lit as was the route taken by defendant.

A physician testified that she examined Anna after the attack and she observed a bruise on her forehead and small perirectal lesions and a small amount of blood in her rectum. The victim was treated for possible venereal disease.

After defendant's motion *in limine* to exclude evidence of other crimes was denied, Scott Staton was allowed to testify. He testified that at approximately 11 p.m. on April 27, 1977, a man whom he identified as defendant grabbed him from behind as he walked near 48th and Ellis Avenue. Defendant pulled him around the corner and told him that if he shouted he would blow his head off. Staton was facing defendant when he said this. Defendant asked if Staton had any money and pulled him to his car. He told Staton to get in and once inside defendant told him that if he tried to get out he would blow his head off. Defendant drove to a parking lot between two houses and stopped the car. He asked Staton for his money and received $6. Defendant told Staton to climb into the back seat, walked around the car and entered from the back right door. Defendant forced Staton to perform an act of oral copulation on him and then told him to get on his stomach and to pull his pants down. He gave Staton a tube of cream and told Staton to put some up his anus. Defendant then had anal intercourse with Staton. Defendant then forced Staton to repeat the series of acts above five or six times. When he had finished, defendant smoked a cigarette and drank from a flat, thin bottle. Staton identified the State's exhibit No. 2 as being similar to the bottle from which defendant drank. Defendant told Staton to return to the front seat after which he drove him near his home.

Staton waited about three days before he reported the incident to the police because he was embarrassed. He gave a description of his assailant to the police and described the car as a brownish four-door with a dark interior but did not give a license number. On May 9, 1977, he viewed a lineup and identified defendant. Staton also stated that the tube which he saw in defendant's car contained a cream-like substance and was rather nondescript, like any other tube.

Chicago police officer Bass' testimony at trial was basically a reiteration of his testimony at the pretrial motion to suppress hearing. At the time of the arrest Bass searched defendant and recovered a half-pint bottle of vodka. He identified State's exhibit 2 as that bottle.

On cross-examination Bass stated that at the time of the arrest the description of the car he had received was a gold two-door late model intermediate car and that defendant's car did not fit this description. However, the license number matched that of the car involved in the attack of the victim. On redirect Bass testified that license number PW 5019 was not in the Secretary of State's computer file.

Chicago police officer Duncan testified that on May 9, 1977, he processed a black-over-gold 1969 Buick Electra four-door sedan at 46th and Woodlawn for evidence relating to a sex-crime investigation. He took several photographs of various parts of the interior and exterior of the car including the license plates which he identified as State's exhibits Nos. 3 through 6. He stated that the color in the photographs was faded somewhat because of the manner in which the film was developed. He also dusted the glass and interior metal surfaces for fingerprints but did not find any suitable for identification purposes. He received State's exhibit No. 1, the tube of vaseline, from Officer Graf, who removed it from the glove compartment.

It was stipulated that defendant applied for a license for his car, the car involved in the crimes, and was issued number PW 5019.

Chicago police officer Mason testified in defense that although Officer Bass had told him that he arrested defendant in a car at 4605 S. Woodlawn, Mason's report stated that defendant was immediately placed under arrest as he got to the vehicle. Officer Mason testified that after he conducted the lineup in which the victim identified defendant he took her to a parking lot where she selected defendant's car from among approximately 300 cars.

William Clegett, defendant's stepfather, testified that on May 7 through 9, 1977, defendant was the owner of a 1969 "Champagne Mist" Buick four-door. At this point the jury was permitted to leave the courtroom and view the car in a parking lot across the street.

Barbara Robinson testified that she had known defendant for 10 or 15 years and was not related to him. On May 7, 1977, she was at 4605 S. Woodlawn visiting a friend from 2 p.m. until 11:30 p.m. Defendant's uncle also lived at that address. She first saw defendant there at about 2 or 3 p.m. and stated that he was there for the majority of the afternoon. At 6 or 7 p.m. they watched a television show in which defendant's mother sang in a choir and then left with defendant at about 11:30 p.m. to see her boyfriend who worked in a gas station. They arrived at the station at about midnight and remained there for a few minutes until defendant drove her home at about 12:05 or 12:10 a.m. She did not see defendant again until trial.

On cross-examination Ms. Robinson testified that she was not sure what time defendant arrived in the afternoon but that he did stay until

11:30 p.m. She could not remember the color of defendant's car and did not recognize the photographs of defendant's car as depicting the car in which she was driven home.

Eileen Clegett, defendant's mother, testified that at about 7:15 p.m. on May 7, 1977, defendant drove her to the Chicago Board of Trade so that she could appear with her church choir on a television program. After dropping her off defendant returned to her brother's home. She returned home on a bus at about 10 p.m. Defendant came home at about 12:30 a.m. She stated that she had never seen State's exhibit No. 1, the tube, in defendant's possession but that it was possible since she had suggested he use some vaseline to "patent up his shoes he was wearing, to keep them from cracking."

On cross-examination Mrs. Clegett testified that defendant arrived at home at about 5:30 or 6 p.m. to take her to the television station. On the way they stopped for gas at about 22d Street. Defendant drove a four-door Buick Electra, dark gray with a black top. She testified that the pictures (State's exhibits Nos. 3 through 6) looked like that car. The defense rested.

In rebuttal, Chicago police officer Shannon testified that on May 7, 1977, at about 5:15 p.m. he was stationed at about 2400 south and the Franklin extension of the Dan Ryan Expressway. At that time he issued a traffic ticket (which was introduced into evidence) to the driver of a Buick, license number PW 5019. The driver's license which was posted belonged to Lydell Walls.

Officer Bass testified that when he arrested defendant on May 9, 1977, he searched defendant and found a vinyl wallet containing a speeding ticket.

The jury found defendant guilty of deviate sexual assault and indecent liberties with a child.

After being advised of the sentencing alternatives, defendant elected to be sentenced under the old code. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—8—1.) He was sentenced to a term of 50 to 100 years for indecent liberties with a child. He appeals.

OPINION

I.

Defendant contends that his warrantless arrest and the warrantless search of his car were illegal and therefore the trial court erred in denying his pretrial motions to quash his arrest and suppress evidence.

A police officer may arrest a person without a warrant when he "has reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1977, ch. 38, par. 107—2(c).) For purposes of arrest, reasonable grounds and probable cause are

synonymous. (*People v. Wright* (1974), 56 Ill. 2d 523, 528, 309 N.E.2d 537.) Whether or not probable cause exists in a particular case depends on the totality of the facts and circumstances known to the officers when the arrest was made. (*People v. Robinson* (1976), 62 Ill. 2d 273, 276-77, 342 N.E.2d 356; *People v. Clay* (1973), 55 Ill. 2d 501, 504, 304 N.E.2d 280.) In deciding the question of probable cause the courts deal with probabilities, the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. (*Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329; *People v. Robinson* (1976), 62 Ill. 2d 273, 277.) Courts recognize that police officers must act upon a quick appraisal of the data before them and that the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals. (*People v. Robinson* (1976), 62 Ill. 2d 273, 277; *People v. Dickerson* (1979), 69 Ill. App. 3d 825, 829, 387 N.E.2d 806.) However, arrests cannot be made on mere suspicion that an individual may have committed an offense. (*People v. Fletcher* (1978), 66 Ill. App. 3d 502, 508, 383 N.E.2d 1285; *People v. Gabbard* (1979), 67 Ill. App. 3d 945, 948, 385 N.E.2d 366, *aff'd* (1979), 78 Ill. 2d 88, 398 N.E.2d 574.) Probable cause exists if a reasonable and prudent man in possession of the knowledge which has come to the arresting officer would believe that the person to be arrested had committed a crime. *People v. Denham* (1968), 41 Ill. 2d 1, 5, 241 N.E.2d 415, *cert. denied* (1969), 394 U.S. 1006, 22 L. Ed. 2d 784, 89 S. Ct. 1605.

■■ Defendant contends that the reason for his arrest was his entry into the car which bore the license number given by Anna and that this was merely based on suspicion that defendant was the sole owner and driver of the car. A review of the evidence presented at the hearing on the motion to suppress demonstrates that the police officers had probable cause to arrest defendant. The police were looking for a black-over-gold late model two-door car bearing license number PW 5019 and a 30-year-old male Negro, between 5 feet 10 inches and 6 feet tall, medium build, dark skin, a medium afro and a mustache. Although the car that Officer Bass located was not a late model two-door but an older model four-door, it matched the color given and had the same license number for which he was searching. This would clearly lead a reasonable man to believe that this was the car involved in Anna's attack. After observing the car on the second night, he saw a man who fit the description of the attacker enter the car. Although the description may have fit a number of black males and not have been so unique as to single out defendant, we feel that his entry of the car used in the attack would lead a reasonable man, acting on a quick appraisal of these circumstances, to believe that this was the man who attacked Anna. We therefore conclude that probable cause existed for defendant's arrest.

■■ Having concluded that defendant's arrest was legal, we must consider whether the warrantless search of his car was legal. It is undisputed that the search was made at the scene of the arrest but after defendant had been transported to the police station. Under these circumstances the search cannot be justified as being incident to the arrest. (See *Preston v. United States* (1964), 376 U.S. 364, 11 L. Ed. 2d 777, 84 S. Ct. 881; *People v. Roberson* (1977), 46 Ill. App. 3d 750, 753, 361 N.E.2d 116; *People v. Fletcher* (1978), 66 Ill. App. 3d 502, 513, 383 N.E.2d 1285.) Nor did the State attempt to justify the search as an inventory search as in *South Dakota v. Opperman* (1976), 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092. Nevertheless, the warrantless search of the automobile in this case was proper since the police had probable cause to believe that the car was an instrument of, or contained evidence of, the crime being investigated. *People v. Peter* (1973), 55 Ill. 2d 443, 456, 303 N.E.2d 398, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627; *People v. Fletcher* (1978), 66 Ill. App. 3d 502, 513; see *Texas v. White* (1975), 423 U.S. 67, 46 L. Ed. 2d 209, 96 S. Ct. 304; see *Arkansas v. Sanders* (1979), 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586.

At the time of the arrest, the police knew that the car was the site of Anna's attack and, in view of the recency of the attack, they could logically infer that evidence of the crime would still be in the car. They therefore had probable cause to search the car. The fact that defendant was in custody and the car secured did not require the police to secure a warrant prior to the search. As the Supreme Court stated in *Chambers v. Maroney* (1970), 399 U.S. 42, 52, 26 L. Ed. 2d 419, 428, 90 S. Ct. 1975, 1981:

> "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

Numerous cases have upheld a warrantless search of a car either at the scene of the arrest or later at a police station under circumstances similar to this case. (See *People v. Blitz* (1977), 68 Ill. 2d 287, 369 N.E.2d 1238, *cert. denied* (1978), 435 U.S. 974, 56 L. Ed. 2d 68, 98 S. Ct. 1622; *People v. Peter*; *People v. Fletcher* (1978), 66 Ill. App. 3d 502, 383 N.E.2d 1285; *People v. Billings* (1977), 52 Ill. App. 3d 414, 367 N.E.2d 337; *People v. Thornton* (1977), 47 Ill. App. 3d 604, 365 N.E.2d 6; *People v. Roberson* (1977), 46 Ill. App. 3d 750, 361 N.E.2d 116; *People v. Lee* (1976), 41 Ill. App. 3d 502, 354 N.E.2d 543.) *People v. Fletcher* involved facts practically indistinguishable from this case. We therefore find that the warrantless search of defendant's car was legal and the trial court properly refused to suppress the vaseline tube.

## II.

Defendant contends that the evidence of the Staton attack was improperly admitted and deprived him of a fair trial. He challenges the admission of the evidence on three grounds: (1) the Staton attack was sufficiently dissimilar so as to be distinguishable; (2) none of the traditional exceptions to rule excluding other crimes evidence is applicable to this case; and (3) even if an exception were applicable, the prejudicial effect of the evidence vastly outweighed its probative value, especially where there was no need for the evidence.

Evidence of extra-indictment offenses is inadmissible unless it is relevant to show motive, intent, identity, absence of mistake or *modus operandi. (People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489; *People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238.) In the instant case the evidence was admitted to show *modus operandi* or a common scheme or plan. Defendant contends that the two crimes were substantially dissimilar and not "so unusual and distinctive as to be like a signature." (McCormick, Evidence §157, at 328 (1954).) He notes that in the Staton attack, the offender identified himself as "Rodney, a pimp" and that no such identification was given in the instant attack. Secondly, he states that one attack was heterosexual while the other was homosexual which he asserts "are so radically different in the twisted appetites they satisfy that they almost never dwell in the same breast."

From the evidence presented at trial, it is clear that both desires dwelled in defendant's breast. The different sexes of the victims is not a critical distinction in this case. The evidence showed that defendant may have mistakenly thought that Anna was a male. She was dressed in jeans and a down jacket and had a short hair cut at the time of the attack. Although she told defendant her name was "Anna" he referred to her as "Arnold." He also asked if she were a homosexual and if anyone had ever told her that she sounded like a girl. These facts suggest that defendant was unaware that the victim was a female. We agree with defendant that such confusion is incomprehensible, but so is the vicious nature of the attacks. In any event, in light of defendant's apparent misconception, we do not find that the different sexes of the victims so distinguishes the two attacks as to make the evidence of the Staton attack inadmissible.

Defendant attempts to distinguish the two attacks in other minor regards such as: (1) Staton did not report being beaten as the instant victim did; and (2) the instant victim reported a lengthy conversation with the attacker while Staton allegedly reported only the attacker's self-description. Defendant studiously ignores the overwhelming similarities in the time, manner and place of the attacks which clearly show the *modus operandi* involved as being that of one man, the defendant.

The crimes happened within a 10-day period. Both victims were

accosted on the street in the same general area, asked for money, and then dragged into a car. Although Staton was not struck, he was told that if he shouted or attempted to escape his head would be blown off. Anna was struck when she attempted to escape and was later told that she would be shot if she tried to leave. It was apparently necessary for defendant to strike Anna to prevent her from escaping, and this fact does not establish a dissimilarity of any consequence. Once in the car, the attacker used a vaseline-like substance which came from a tube and forced both victims to perform repeated acts of oral and anal intercourse. After each attack defendant smoked a cigarette and drank from a flat bottle which both victims identified at trial. Contrary to defendant's suggestion, the similarities in this case are striking and the evidence of the Staton attack was properly admitted to show a common scheme or design and *modus operandi. People v. Gonzales* (1978), 60 Ill. App. 3d 980, 992, 377 N.E.2d 91; *People v. Osborn* (1977), 53 Ill. App. 3d 312, 323, 368 N.E.2d 608, *cert. denied* (1978), 439 U.S. 837, 58 L. Ed. 2d 134, 99 S. Ct. 122; *People v. Middleton* (1976), 38 Ill. App. 3d 984, 990, 350 N.E.2d 223.

Defendant cites *People v. Connors* (1980), 82 Ill. App. 3d 312, 402 N.E.2d 773, as being dispositive of this issue. There, defendant was being tried for an armed robbery which occurred at about 11:35 p.m. The State introduced evidence of another armed robbery which occurred at about 7:15 p.m. on the same day. In the earlier robbery, defendant stole a car which later aided police in his apprehension for both robberies. The court noted the general rule that evidence of other crimes should not be introduced under the *modus operandi* exception unless the two are so identical as to "earmark" each as the crime of one man. The only similarities in the crimes were that they both occurred at night, involved a gun, and were near the victim's car. The court found that these similarities were insufficient to show *modus operandi* as were the similar phrases said by the robbers which were common to crimes in general. Additionally, there was no link made between the stolen car and the second robbery. Since the evidence showed defendant's propensity to commit crime and did not fit one of the general exceptions, the admission of the evidence was held to be error.

*Connors* is a far cry from the instant case. In that case the other-crimes evidence did not fit an exception to the general rule of inadmissibility and was used to show defendant's propensity to commit crime. There was nothing so unique or distinguishing about the two armed robberies as to earmark them as the work of one man nor were the two robberies otherwise related. In the instant case, the Staton attack closely paralleled Anna's attack in various unique and specific details and the evidence was properly received to show *modus operandi*. We therefore find *Connors* to be inapposite.

Defendant also contends that even if the evidence of the Staton attack satisfied the *modus operandi* exception, the evidence should have been excluded since the prejudicial effect outweighed its probative value, especially since there was no actual need for the evidence. Defendant contends that Staton's testimony added nothing to the victim's identification and that where the identity of the defendant can be clearly shown without the use of other-crimes evidence, the evidence is inadmissible. *People v. Blakely* (1972), 8 Ill. App. 3d 78, 83, 289 N.E.2d 273.

The following language found in *People v. Oliver* (1977), 50 Ill. App. 3d 665, 675, 365 N.E.2d 618, is apropos:

> "This evidence fairly tends to establish that both crimes were committed by the same man. Whether that man was the defendant was a question of fact for the jury, based on their assessment of the credibility of the identification testimony."

In the instant case defendant cross-examined Anna regarding her identification attempting to discredit it by pointing out that there were no lights in the car during the attack and that she did not give a complete description of the assailant to the police who first came to her home. Although Anna's identification was positive and credible, defendant put the identification in issue. The evidence of the attack on Staton, although admittedly prejudicial, was necessary and probative to aid the jury in the assessment of Anna's identification.

Where the prejudicial effect of the evidence outweighs any probative value, it should be excluded. (*People v. Oliver; People v. Butler* (1971), 133 Ill. App. 2d 299, 302, 273 N.E.2d 37.) This decision is left to the discretion of the trial court. (*People v. Gonzales* (1978), 60 Ill. App. 3d 980, 993, 377 N.E.2d 91; *People v. Rogers* (1975), 31 Ill. App. 3d 981, 985, 335 N.E.2d 48.) A review of the record shows that the trial court cursorily balanced the probative value against the prejudice and decided to admit the evidence. Considering the similarities between the crimes and the issue of identity, we cannot say that the trial court abused its discretion in admitting the evidence.

Defendant asserts that Staton's testimony unnecessarily detailed repeated acts perpetrated upon him by defendant. Actually, Staton merely stated that the series of acts took place five or six times without detailing the acts. The evidence was relevant to show the repetitious nature of defendant's acts which was similar in Anna's attack. The testimony was not so prejudicial to require its exclusion. *People v. Gonzales.*

### III.

Defendant contends that the rebuttal evidence presented by the State

was erroneously admitted since it allowed the jury to consider irrelevant, immaterial, and incompetent evidence pertaining to defendant's alibi. He contends that the evidence showing that he was arrested for a traffic violation at about 5:15 p.m. on May 7, 1977, did not contradict or rebut any evidence he presented since no actual evidence was presented concerning his whereabouts at that time. In addition, he argues that his location at 5:15 p.m. is immaterial since the crucial time period was about 11:30 p.m. and 12:30 a.m. that night. Finally, defendant asserts that the traffic ticket was improperly admitted as substantive evidence.

■■ Defendant notes that Ms. Robinson never testified that she was with defendant at 5:15 p.m. or that he was with her all afternoon. She could not remember the exact time he arrived at the apartment in the afternoon and stated that he was there for only a majority of the afternoon. She was never asked about the traffic ticket. Although Ms. Robinson did not pinpoint defendant's arrival, she stated that it was "Maybe 2:00 or 3:00 o'clock in the afternoon." It is true that defendant's whereabouts at 5:15 p.m. was not a material issue in the case. However, Ms. Robinson did testify that defendant was with her for the majority of the afternoon after 2 or 3 p.m., watched an hour television show at 6 or 7 p.m., and then left with her at about 11:30 p.m. While defendant's alibi witness did not specifically say that he was present at 5:15 p.m., her testimony clearly suggests that he was present from 2 or 3 p.m. until 11:30 p.m. The evidence that defendant was somewhere else at 5:15 p.m. was relevant to show that defendant was not present during the entire period suggested by the alibi and was not so remote as to constitute a collateral matter or to be irrelevant. *People v. Mannen* (1977), 46 Ill. App. 3d 61, 63-64, 360 N.E.2d 563; see *People v. Cepolski* (1979), 79 Ill. App. 3d 230, 240-41, 398 N.E.2d 351.

■■ Defendant also contends that the traffic ticket was improperly admitted into evidence to rebut Ms. Robinson's alibi testimony and to identify defendant. Police reports are generally not admissible into evidence. (*People v. Morris* (1978), 65 Ill. App. 3d 155, 161, 382 N.E.2d 383; *People v. Richardson* (1977), 48 Ill. App. 3d 307, 310, 362 N.E.2d 1104; Ill. Rev. Stat. 1977, ch. 38, par. 115—5(c)(2).) Although they may not be used to divulge substantive information, police reports may be used for impeachment (*People v. Turner* (1963), 29 Ill. 2d 379, 383, 194 N.E.2d 349; see *People v. Ostrand* (1966), 35 Ill. 2d 520, 531, 221 N.E.2d 499), to refresh a witness' recollection (*Hall v. Baum Corp.* (1973), 12 Ill. App. 3d 755, 760, 299 N.E.2d 156; *People v. Morris*) or as past recollection recorded (*People v. Carter* (1979), 72 Ill. App. 3d 871, 876, 391 N.E.2d 427). Here, the traffic ticket was not properly admitted as past recollection recorded since no proper foundation was laid for its

admission. (See *Rigor v. Howard Liquors, Inc.* (1973), 10 Ill. App. 3d 1004, 1010-11, 295 N.E.2d 491.) The State contends that the ticket was introduced to refresh Officer Shannon's recollection. However, this purpose could have been accomplished without introducing the exhibit into evidence. We conclude that the admission of the traffic ticket into evidence was error. *People v. McGhee* (1974), 20 Ill. App. 3d 915, 924, 314 N.E.2d 313.

Although the admission of the traffic ticket into evidence was error, it appears that its admission could not have reasonably affected the jury's verdict and was therefore harmless. (*People v. Rose* (1979), 77 Ill. App. 3d 330, 337, 395 N.E.2d 1081; *People v. Castillo* (1976), 40 Ill. App. 3d 413, 420, 352 N.E.2d 340.) Officers Shannon and Bass' testimony considered together clearly showed that defendant received a traffic citation at about 5:15 p.m. on May 7, 1977, on the Franklin extension. The ticket itself added nothing of substantive value to their testimony and was not used to prove the offense alleged in the ticket but to rebut Ms. Robinson's alibi testimony. Further, we fail to see how defendant was prejudiced by the admission of this evidence when his mother testified that he picked her up at about 5:30 p.m. and stopped for gas near the location where defendant was ticketed at the same general time. Defendant himself introduced evidence which would cast doubt on Ms. Robinson's claim that he was with her for the majority of the afternoon. In view of the overwhelming evidence of guilt and defendant's introduction of evidence of a similar nature, we find that the admission of the traffic ticket was harmless beyond a reasonable doubt.

## IV.

Defendant contends that he was denied a fair trial by prosecutorial misconduct during closing argument. First, defendant asserts that the prosecutor misstated evidence regarding his alibi when he told the jury that Ms. Robinson testified that defendant was at the apartment with her from 3 or 4 p.m. until 11:30 p.m. when in fact she said that she could not recall the exact time of his arrival. A review of Ms. Robinson's testimony reveals that when asked if she could recall when she first saw defendant at the apartment, she responded, "Not actually. Maybe 2:00 or 3:00 o'clock in the afternoon." Although the prosecutor misstated the time by an hour, the clear import of Ms. Robinson's testimony was that defendant was with her all afternoon and the comment was a proper inference to draw from the evidence.

Defendant also contends that the prosecutor misstated the evidence regarding the location of the car on May 8 when he stated that Mr. Clegett was driving or working on the car on that night. Taken in the context of

the prosecutor's argument, the comment was made to show that on the night of May 7-8, defendant's stepfather had not seen defendant at home during the time of the crime. The prosecutor may have misstated the date as the 8th instead of the 7th, but it is clear that he was referring to the night of the attack on Anna. In addition, the location of the car was not the focus of the argument but rather the absence of defendant from his home. Defendant has not shown how the misstatement prejudiced him nor do we perceive any harm to him.

Defendant complains that the prosecutor stated that the evidence technician found no fingerprints on the interior door handle of the car, when in fact he found smudges which were unsuitable for comparison. It is clear from later comments made in the argument that the prosecutor was explaining the absence of fingerprint evidence at trial and was suggesting that no single print was found which was consistent with the evidence.

Defendant also contends that the prosecutor expressed his personal belief concerning the alibi and misstated the evidence when he said that Ms. Robinson said that defendant was at the apartment after 3 or 4 p.m. and "We know that cannot be true" because he received the traffic ticket at about 5:15 p.m. As already discussed, the time frame mentioned by the prosecutor was an inference from Ms. Robinson's testimony and not a harmful misstatement of the evidence. In addition, the use of the word "We know" was not done to convey the prosecutor's personal belief of defendant's guilt but rather to comment on the credibility of defendant's alibi witness. A prosecutor may call a witness' testimony false if he relies on the evidence and inference from it to support his conclusion. (*People v. Baker* (1979), 78 Ill. App. 3d 411, 421, 396 N.E.2d 1174; *People v. Owens* (1977), 46 Ill. App. 3d 978, 994, 361 N.E.2d 644.) From the evidence presented in rebuttal, the clear inference was that Ms. Robinson was mistaken about defendant's whereabouts during the period she mentioned. We therefore conclude that the remark was not improper.

Defendant complains of several other instances of alleged prosecutorial misconduct. A review of the record does not reveal that any of the allegedly improper comments either singularly or cumulatively prejudiced defendant or were of such a nature as to constitute reversible error. In light of the overwhelming evidence of defendant's guilt, the remarks did not constitute a material factor in defendant's conviction (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363) or result in substantial prejudice to defendant (*People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881), nor would the verdict have been different had the comments not been made (*People v. Naujokas* (1962), 25 Ill. 2d 32, 38, 182 N.E.2d 700). We therefore find it unnecessary to address this issue further.

## V.

Defendant contends that cumulative trial errors denied him substantial justice and that the jury's verdict was the result of these errors. He recognizes that a verdict will not be reversed unless the evidence is "so palpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused." (*People v. Reese* (1973), 54 Ill. 2d 51, 58, 294 N.E.2d 288.) He argues that the trial errors influenced at least some of the jurors to the extent that they could not be fair or impartial (see *People v. Manzella* (1973), 56 Ill. 2d 187, 200, 306 N.E.2d 16, *cert. denied* (1974), 417 U.S. 933, 41 L. Ed. 2d 236, 94 S. Ct. 2644) and that by the admission of certain evidence, defendant's guilt was not proven beyond a reasonable doubt by "satisfactory" evidence.

■■ Defendant relies on the alleged errors discussed earlier. As we have already concluded, none of the points raised by defendant constitutes reversible error. Since defendant's argument presupposes reversible trial error and none occurred, this contention is without merit. Defendant does not challenge the sufficiency of the evidence, just its competency. The evidence presented was properly admitted and competent to establish guilt beyond a reasonable doubt. The victim viewed defendant under circumstances which would permit a positive identification. She positively identified defendant in a lineup and again at trial. Her testimony alone was sufficient to convict defendant. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) When her testimony is considered with the other evidence presented at trial, it is apparent that the jury's verdict was supported by the evidence and that defendant was proven guilty beyond a reasonable doubt by competent evidence.

## VI.

Defendant contends that his sentence is excessive and totally inconsistent with any rehabilitative goal in view of his background. He asserts that the sentence fails to recognize that "no permanent, serious physical injury was suffered by either victim" and then lists seriatim murder cases in which the sentences were reduced on appeal to between 14 and 60 years. While the collection of sentence reduction cases is edifying, it is totally irrelevant to a consideration of the propriety of this defendant's sentence. The issue before this court is whether the trial court's sentence was an abuse of discretion which would permit it to be altered on review. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.

In reaching a sentencing determination, the trial court considers the defendant's credibility, demeanor, general moral character, mentality,

social environment, habits, and age and must balance the need to protect society's interests with the desire to rehabilitate the defendant. *(People v. Perruquet.)* The record reveals that at the time of the instant offense, defendant was on parole from a sentence of 15 to 25 years for a prior rape conviction. While on parole he was charged with various offenses stemming from: (1) the Staton attack; (2) the instant attack; and (3) an unlawful use of weapons incident. A review of the trial court's remarks before the imposition of sentence reveals that he considered defendant's poor potential for rehabilitation, the serious nature of the offense, his prior record and other factors in aggravation. The fact that neither victim suffered permanent physical harm does not alter the heinous nature of the crime involved. The sentence was within the statutory limits for a crime of this nature, a Class 1 felony. Ill. Rev. Stat. 1977, ch. 38, pars. 11—3 and 1005—8—1(b)(2) and (c)(2).

When the trial judge sentenced defendant he noted that he had never before sentenced a person who had previously received a severe sentence and had been released from prison for this type of offense. The court's stated purpose in sentencing defendant to "the most severe sentence I have ever imposed on a non-murder case" was to assure the public that he would not commit this type of offense again. As the court stated in *People v. Heflin* (1978), 71 Ill. 2d 525, 545, 376 N.E.2d 1367, *cert. denied* (1979), 439 U.S. 1074, 59 L. Ed. 2d 41, 99 S. Ct. 848:

> "This court will not disturb a sentence imposed by the trial court unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose. [Citation.] In this State, the spirit and purpose of the law are upheld when a sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant."

Considering the failure of defendant's first imprisonment to rehabilitate him, the vicious nature of the attacks, his propensity to commit the attacks, and society's interest in protection from defendant, we do not find that the sentence imposed, though admittedly severe, was an abuse of discretion.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.